# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DE CARLOS M. YOUNG,

        Plaintiff,

    v.                                            Case No. 09-C-1178

PETER ERICKSEN, *et al.,*

        Defendants.

## DECISION AND ORDER

Plaintiff De Carlos M. Young, a state prisoner serving a sentence at the Green Bay Correctional Institution ("GBCI"), filed this *pro se* civil rights action pursuant to 42 U.S.C. 1983, claiming that correctional officers and staff at GBCI violated his constitutional rights by refusing to allow him to exercise outside his cell for almost an entire year. Young also claims the defendants violated his rights under the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Person Act ("RELUIPA"), 42 U.S.C. § 2000-cc, by refusing to allow him to attend religious services and meet with an Imam. The defendants include GBCI Warden William Pollard, Security Director Peter Erickson, and Program Supervisor Sarah Cooper. The matter is now before me on defendants' motion for summary judgment. For the reasons set forth herein the motion for summary judgment will be denied.

## BACKGROUND

Young is currently serving a 35-year sentence for homicide. Allegedly a member of a gang known as the "Murda Mob", he was convicted of shooting and killing a member of a rival gang in

2001. He was transferred to GBCI from Columbia Correctional Institution ("CCI") on March 12, 2009, and housed in Segregation until April 25, 2009, when he was transferred to the Step Unit. The Step Unit is a former receiving area, contained within the Treatment Center building. It houses inmates who have been placed on Administrative Confinement status, inmates who are on "Do Not Move" or Protective Confinement ("PC") status, as well as inmates who are in transition from Segregation to the general population.

The defendants contend that sometime after Young's arrival, Lieutenant William Swiekatowski, who serves as the Security Threat Group Specialist at GBCI, learned through other inmates that if Young was placed in GP, he would be targeted by rival gang members in retaliation for killing one of their leaders. Although Young disputes the assertion that Lieutenant Swiekatowski received such information and notes that there is no documentation to support it, he apparently wrote a letter to Swiekatowski on or about March 16, 2009, in which he expressed concern over being housed in GP. Young stated in the letter that he had received threats while at GBCI and noted that his victim had powerful family members at GBCI who held prominent positions in rival gangs. Young also stated that if he was attacked he would take others with him and that he would probably have to kill in order to stay alive if he was housed in GP. Young closed by stating that if he stayed at GBCI, he and others would be in danger, and if anyone was hurt, the blame would fall on those he had warned. (Def.'s PFOF ¶ 19.) As a result of the concern for Young's safety and the security of the institution, Young was placed in PC status in the Step Unit as of July 13, 2009.

At the time all this occurred, GBCI Inmates in Segregation were allowed to exercise outside in a "recreation cage" that kept them separated from the general population. Although GBCI staff

planned to build similar "recreation cages" outside the Treatment Center building that housed the Step Unit, the project was put on hold due to budget constraints. At some point in August 2009, staff converted a storage area into a day room with a television and, eventually, a treadmill, so that it could be used as an exercise area. Although inmates in the Step Unit were to be allowed on hour of out-of-cell leisure time in the area each week, inmates on PC status, such as Young, were not eligible to use the room. Instead, according to the defendants, Young was expected to undertake an in-cell fitness program which was outlined in the Segregation Handbook which he had been given.

On July 23, 2009, Young filed an internal inmate complaint with GCBI alleging that he had been denied out-of-cell recreation while in the Step Unit. The complaint was dismissed by the Inmate Complaint Examiner ("ICE") based on Security Director Erickson's assurance that the institution was "looking into a recreation area for inmates housed in the location in which Mr. Young is housed." (Decl. of De'Carlos M. Young Authenticating Exs., Ex. 019.) Young filed another complaint on September 10, 2009, which was likewise dismissed by the ICE. (*Id.*, Ex. 022.) On appeal, however, the Corrections Complaint Examiner ("CCE") recommended that Young's complaint be affirmed, noting that other inmates housed in the Step Unit were allowed out-of-cell recreation. (*Id.*, Ex. 025.) The CCE also directed that corrective action be taken at by GBCI within thirty days of the Deputy Secretary's acceptance of the CCE's recommendation, which occurred on October 24, 2009. A copy of the decision was sent to Warden Pollard. (*Id.*) Despite this directive, Young was not allowed out-of-cell recreation until June 2010.

While on PC Young's request to attend Jumu'ah, a Muslim religious group service held on Fridays, was also denied. The Jumu'ah service typically attracts approximately 75 inmates at GBCI.

3

Prison officials determined that allowing Plaintiff to attend the service would jeopardize his safety, as well as the safety of other inmates and the staff. (Def.'s PFOF ¶ 26.) Young was also denied a visit with a volunteer Islamic Imam who came to GBCI to see him. (Pl.'s PFOF ¶ 7.)

Defendants argue that Young was placed in PC for his own protection, as well as for the safety and security of the institution. Denying him out-of-cell exercise, they claim, was necessary to protect him from other inmates and also to protect prison staff from the danger of having to intervene to prevent such attacks. They contend that Young could have remained in Segregation where he would have had the opportunity to participate in outdoor recreation, but chose to accept a transfer to the Step Unit. The defendants also contend that Young had room to exercise in his cell. For these reasons, the defendants argue they are entitled to summary judgment on Young's Eighth Amendment claim.

For the same reasons, the defendants argue that Young's First Amendment and RLUIPA claims fail. Young was not allowed to attend religious services for his own protection. But he was allowed to worship in his own cell and he could have written to the prison Chaplain to request a one-on-one visit with a volunteer Islamic clergy or other spiritual advisor. Based on these facts, the defendants argue that they are also entitled to summary judgment on Young's free exercise and RLUIPA claims.

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is required "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of

some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a dispute that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986), courts should act with caution in granting summary judgment, *Anderson*, 477 U.S. at 255. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. *Id.* at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 323-24. Neither party may rest on mere allegations or denials in the pleadings, *Anderson*, 477 U.S. at 248, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, it is "not required to draw every conceivable inference from the

record - only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

**B. Eighth Amendment Claim**

The Eighth Amendment proscribes cruel and unusual punishment. U.S. Const. amend. VIII. The Supreme Court has interpreted these words "in a flexible and dynamic manner." *Gregg v. Georgia*, 428 U.S. 153, 171 (1976). They impose limits not only on the severity of the sentence that can be directly imposed as punishment for a crime, but also on the conditions of confinement to which an inmate serving a lawful sentence can be subjected. *Rhodes v. Chapman*, 452 U.S. 337, 346-47 (1981). While the Eighth Amendment does not mandate comfortable prisons, prisoners do have the right to "the minimal civilized measure of life's necessities." *Id.* at 347; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These necessities have been held to include adequate food, clothing, shelter, and medical care, as well as reasonable protection from known threats to an inmates safety. *Id.* at 832. As relevant here, the minimal civilized measure of life's necessities has also been held to include an opportunity for out-of-cell exercise when an inmate is held in segregation for prolonged periods of time.

In *Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir.1988), the Seventh Circuit upheld, as not clearly erroneous, a judge's finding that the Eighth Amendment entitled prisoners held in segregation for 90 days or more to five hours of out-of-cell exercise a week. Thirteen years later, in *Pearson v. Ramos*, 237 F.3d 881, 884 (7th Cir. 2001), the Court pronounced it "a reasonable rule that a denial of yard privileges for no more than 90 days at a stretch is not cruel and unusual punishment," thereby implying that confinement in a cell for more than 90 days without the

6

opportunity for outside exercise would amount to cruel and unusual punishment. *Pearson* also

explained the reason for such a rule:

> Confinement in segregation is an approximation to solitary confinement, and
> evidence that this court in *Davenport* found convincing indicates that long stretches
> of such confinement can have serious adverse effects on prisoners' psychological
> well-being. When unrelieved by opportunities for out-of-cell exercise, such
> confinement could reasonably be described as cruel and, by reference to the current
> norms of American prisons, unusual. Tighter limits on the right to exercise have
> been upheld when the period of restriction was shorter than 90 days.

*Id.*

Notwithstanding its acknowledgment of, and its explanation for, its ruling in *Davenport*,

however, the *Pearson* Court reversed a district court's judgment entered on a jury's verdict

awarding an inmate $15,000 in compensatory damages and $50,000 (which the district court

reduced to $15,000) in punitive damages for harm that the inmate claimed to have suffered as a

result of being denied access to the prison yard for exercise for an entire year. *Id.* at 885. In

*Pearson*, the inmate plaintiff received four consecutive 90-day placements in punitive segregation

for four separate serious infractions involving actual harm and the threat of serious harm to prison

staff and other inmates. Given the number and serious nature of the violations, the Court held that

"[p]reventing access to the yard was a reasonable method of protecting the staff and the other

prisoners from his violent propensities" and that under the circumstances denial of yard privileges

for a year did not cause sufficient harm that it would be considered "intolerable to the sensibilities

of a civilized society no matter what the circumstances." *Id.*

The defendants seek to apply the ultimate holding of *Pearson* here. They argue that denying

Young out-of-cell exercise was necessary to prevent him from attacking staff, to protect him from

being attacked by other inmates, and to protect prison staff from the danger of having to intervene

7

to prevent such an attack. (Def.'s Br. In Supp. of Mot. for S.J. at 3.) In addition, they argue that Young had ample room to exercise in his own cell which they contend was larger than those in the general population and even had a window that could be cranked open at his request. Finally, the defendants argue that Young had been offered the opportunity to stay in Segregation where he would have had the opportunity to exercise in the recreation cage, but opted to move to the Step Unit so that he could have access to electronic appliances such as a radio, television or fan. (*Id.*) In light of these facts, the defendants argue Young's Eighth Amendment claim must fail.

The defendants' argument is unpersuasive. *Pearson* involved an inmate whose conduct, the Court concluded, left no choice but to keep him confined to his cell. 237 F.3d at 885 ("To confine in 'solitary' a prisoner who behaves like a wild beast whenever he is let out of his cell is the least cruel measure that occurs to us for dealing with such a person."). Young, by contrast, at least on this record, committed no infraction. His removal from the general population was for his protection, not because he had attacked others. Even the defendants' supervisors at the Wisconsin Department of Corrections could find no justification for their continued denial of Young's request for out-of-cell exercise. Yet the defendants failed to offer him an opportunity to exercise outside of this cell for more than six months after they were told to do so.

As for the defendants' remaining arguments, factual disputes prevent ruling in their favor at this stage of the proceedings. Young denies that he ever had a conversation in which he was told that if he opted to leave Segregation and go to the Step Unit he would be denied the opportunity for out-of-cell exercise. (Pl.'s Response to Def.'s PFOF ¶ 12.) And it is far from clear that Young's cell in the Step Unit was sufficiently large to permit reasonable exercise. While the defendants claim it was larger than the cells of inmates in the general population, the record indicates it is less

8

than six feet wide and a little more than ten feet in length. (Def.'s PFOF ¶ 41.) Assuming the cell also contained at least a bed, sink, and toilet, I cannot conclude as a matter of law that Young would have had sufficient room to exercise. Moreover, while it would seem that denial of out-of-cell exercise is not equivalent to a complete denial of the right to exercise, the Seventh Circuit has focused on the out-of-cell aspect of exercise, noting that "[t]o deny a prisoner all opportunity for exercise outside his cell would, the cases suggest, violate the Eighth Amendment unless the prisoner posed an acute security risk if allowed out of his cell for even a short time." *Anderson v. Romero,* 72 F.3d 518, 527 (7th Cir.1995). Thus, the size of the cell may not be determinative in any event.

In sum, there is a factual dispute over whether defendants fairly denied Plaintiff "the minimal civilized measure of life's necessities " by denying him out-of-cell exercise. On this record, the defendants are not entitled to summary judgment on Young's Eighth Amendment claim.

## C. Free Exercise and RLUIPA Claim

Young also claims that he has been, and is being, denied the opportunity to attend religious worship services in violation of his rights under the Free Exercise Clause of the First Amendment and RLUIPA, 42 U.S.C. § 2000cc-1(a). The First Amendment right to freely exercise one's religion extends to inmates, *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009), but prison officials may restrict this right if the restriction is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987). RLUIPA likewise protects the right of prison inmates to practice their religion and places an even greater burden on prison officials who seek to justify policies or practices that impose a substantial burden on religious practice. RLUIPA provides that:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). The statute itself does not expressly define what constitutes a "substantial burden," but the Seventh Circuit has stated that, "a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003); *see also Nelson v. Miller*, 570 F.3d 868, 878 (7th Cir. 2009). More importantly, RLUIPA requires a compelling governmental interest to justify a practice or policy that creates a substantial burden on an inmate's religious exercise. This is more than the reasonable relation to a legitimate penological interest required under current First Amendment precedent. *O'Lone*, 482 U.S. at 349. In addition, RLUIPA requires government agents to demonstrate that the policy they adopted is "the least restrictive means of furthering the compelling governmental interest."

Defendants claim that their refusal to allow Young to attend Jumu'ah was justified. Allowing Young to attend religious services on every Friday with 75 other Muslim inmates, they contend, would "jeopardize his safety as well as the safety of staff and other inmates." (DPFF at ¶ 26 and Swiekatowski Affidavit at ¶ 27.) They also argue that Young was free to worship in his cell and arrange a one-on-one visit with the volunteer Imam. Given these facts, the defendants claim Young's First Amendment and RLUIPA claims fail as well.

10

Here, too, it appears that factual disputes preclude entry of summary judgment. Certainly, prison officials have a strong interest in protecting Young from attacks by other inmates. Failure to do so could also subject them to substantial liability. *See Farmer v. Brennan*, 511 U.S. at 832 (noting that prison officials must "take reasonable measures to guarantee the safety of the inmates . . ."). It therefore appears on this record that prison officials were entirely justified in placing Young on PC status. After all, Young himself reported to Lieutenant Swiekatowski that he had been threatened and that he feared for his safety. The question that remains, however, is whether denying Young the opportunity to attend Jumu'ah while he was on PC status was justified under the First Amendment and RLUIPA.

Denying an inmate on PC status the opportunity to attend public worship services may be reasonably related to the prison's interest in insuring the protection of an inmate and maintaining overall security, especially if there are alternative ways of practicing one's religion. The mere fact that Young had not been attacked on previous occasions when he attended Jumu'ah does not mean that the defendants were unreasonable in believing that he was at substantial risk even while attending religious services. Thus, the defendants may be correct that denying Young the opportunity to attend Jumu'ah under the circumstances of this case did not violate his rights under the Free Exercise Clause of the First Amendment. The same cannot be said, however, with respect to his rights under RLUIPA. The defendants have made no showing that denying Young the opportunity to attend Jumu'ah was the least restrictive means of insuring his safety. Thus, Young's claim that the defendants violated his rights by denying him the opportunity to attend Jumu'ah must remain.

Wholly apart from these considerations, concerns for Young's safety and the security of the institution would not explain why Young was denied a visit with the volunteer Imam who came to see him on February 1, 2010. The form completed by the guard states that the visit was denied because "Your Segregation / Disciplinary Status prevented visit". (Young Ex. 018.) Although Lieutenant Swiekatowski states that the visit was also disallowed because there was no record that the proper Pastoral visiting procedure had been followed, the sole document he cites as support for his assertion does not list failure to comply with procedural requirements as a reason for the denial. Under these circumstances, given the heavy burden RLUIPA places on the defendants to justify a substantial burden on an inmate's religious exercise and the lack of evidentiary support for Lieutenant Swiekatowski's assertion of a procedural justification for denying Young visitation with the Imam, summary judgment would be inappropriate on Young's Free Exercise and RLUIPA claims.

## D. Qualified Immunity

Finally, defendants contend that even if the Court declines to grant summary judgment on the merits on Young's claims, summary judgment should nevertheless be granted because they are entitled to good faith immunity. The qualified immunity defense "gives public officials the benefit of legal doubts" when making official decisions. *Elliot v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991), *cert. denied sub nom. Propst v. Weir*, 502 U.S. 1074 (1992). Under this doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Defendants argue that, even if they are found to have violated Plaintiff's constitutional

rights, they are entitled to qualified immunity because the violations they allegedly committed were not clearly established. (Def. Br. in Supp., Dkt. 22, at 5-8.)

Qualified immunity fails to defeat Young's Eighth Amendment out-of-cell exercise claim. The law concerning such claims was clearly established long before July 21, 2009, the date Young was denied out-of-cell recreation. As already noted, Seventh Circuit precedent has long held that lack of exercise could constitute a constitutional violation. *Davenport v. DeRobertis* was decided in 1988 and *Anderson v. Romero* in 1995. *See also French v. Owens,*, 777 F.2d 1250, 1255 (7th Cir. 1985) ("Lack of exercise may certainly rise to a constitutional violation. Where movement is denied and muscles are allowed to atrophy, the health of the individual is threatened and the state's constitutional obligation is compromised."). More recently, the Seventh Circuit rejected a qualified immunity defense similar to the one advanced by the defendants here, noting that "[i]n light of *Davenport* and *Anderson*, it was objectively unreasonable for prison officials to institute a complete 6 month denial of all out-of-cell exercise privileges for segregated prisoners." *Delaney v. DeTella,* 256 F.3d 679, 687 (7th Cir. 2001). Here, the denial continued even after the Wisconsin Department of Corrections directed GBCI to take corrective action with regard to Young's out-of-cell exercise. Under these circumstances, I cannot find as a matter of law that the defendants could have reasonably believed that denying Young out-of-cell exercise for almost an entire year would not constitute a violation of his Eighth Amendment rights.

The defendants claim of qualified immunity as to Young's First Amendment and RLUIPA claims also fails. *See Conyers v. Abitz,* 416 F.3d 580, 586 (7th Cir. 2005) (finding clearly established law that prison officials must have a legitimate penological interest before imposing a substantial burden on the free exercise of an inmate's religion, even when that inmate is in

13

disciplinary segregation); *Gill v. Hoadley,* 261 F.Supp.2d 113, 126 (N.D.N.Y. 2003) ("it is unquestioned that the right of an inmate to freely exercise his or her religion by attending congregate religious services, absent legitimate penological concerns mitigating to the contrary, was and has been clearly established"). As stated above, a genuine issue of material fact exists over whether the defendants had legitimate penological concerns sufficient to deny Young's visit with the volunteer Imam. Young's right to exercise his religion was sufficiently clear in light of prior precedent and RLUIPA; thus, the defendants are not entitled to summary judgment on grounds of qualified immunity.

## CONCLUSION

In sum, genuine issues of material fact exist related to whether the Defendants violated Plaintiff's constitutional and statutory rights. The Defendants' motion for summary judgment is therefore denied and the Clerk is directed to set this matter for a telephone scheduling conference.

**SO ORDERED** this ____20th____ day of December, 2010.

    s/ William C. Griesbach
William C. Griesbach
United States District Judge

14